We'll now call our second case of this morning, and it's, how do I, E-I-S-A-I?  Azai. Azai. Okay, I'm just going to be, Sanofi Aventis USLLC, Mr. Fastow, and Mr. Carey. Great, thank you. Is it Fastow or Fastow? Fastow. Fastow. Okay, put the impronses in the wrong syllable. Thank you. Thank you, Jay Fastow for the plaintiff Azai, and might I reserve three minutes for rebuttal? Yes, sir. Thank you. The position of the defendant in this case, Sanofi, is a lonely one. In a series of three cases, Lepage's en banc, Bensply, which Sanofi doesn't even mention, and then ZF Meritor, this court has rejected Sanofi's positions. In fact, even the dissent in ZF Meritor rejected the argument that the safe harbor applied there, saying that the market share targets and data book placement provisions there were, quote, non-price. And the facts in this case are a fortiori from plaintiff's perspective, for plaintiffs, compared to even those three cases that held for plaintiffs in at least three major ways. First, high price versus lower price. Second, even broader extent of anti-competitive conduct. And third, lack of even any proper competitive justification. At this point, can you point to any evidence other than Professor Elhage's report and the Fragment's lower price that Sanofi's price structure actually suppressed competition? What evidence would you point to besides what I just noted? We would point to the evidence of the data of what happened to price. And let's keep in mind to start with Professor Rosenblatt. Rosenblatt explains that as in normal economics, in a pharmaceutical market where you have a monopoly and then you have competitors of quality products at lower prices, you expect prices to go down. But that's not what happened here. Sanofi's prices were, generally speaking, were the protective order, substantially higher, substantially the highest in the market. Are you calculating that before or after the discount? Your Honor, the price trend goes either way. If you look at Elhage's Figures 3 and Figure 6, Figure 3 compares the average price of Sanofi compared to the average price of Fragment, a sized product. Professor, how do you pronounce his last name again? Elhage. Elhage, okay. And then Figure 6 breaks down the Sanofi price. Fragment's prices remain stable? Fragment's prices, over the relevant time, went up. Increased also. They went up. And let me make one point on that. That's like in the case of Densply. In Densply, there was an argument that the competitors of Densply weren't very aggressive. And this Court said no, it wasn't apathy. What it was was the result of Densply's anti-competitive policies. Here, what Sanofi did, for example, the formulary access clause, it says we're going to take away from you any benefit from lowering your price further. The price already was substantially lower. And that's in comparison to ZF-Narator, where the Court said that the defendant's price was lower. I'm sorry. I don't know if you were answering the gentleman's question, which I'm still thinking about, which is evidence of suppression of competition. The evidence of suppression of competition, I'll go back to that one, is that you would expect when you have comparable products, competitive products at lower prices, that prices would go down. Here instead, Sanofi both maintained its monopoly share and continued to raise its price. And that's what's a fortiori in this case from any of the three cases that held for plaintiffs. In the same period, a size market share doubled. Sorry? In the same period, a size market share doubled. It went from 4% to 8%. But that's not the issue. The issue is whether it would have been higher but for Sanofi's anti-competitive conduct. And what we see is that, for example, Professor Elhag explains that 68% to 84% of the market was foreclosed to the rivals of Sanofi. He's saying the Sanofi effect is a dead zone. Is it fair to say that his theory is that the overlapping functions of the drug are the contestable part and that what one drug can only do that no other drug can in terms of treatment is the incontestable part? What he's saying, I think, a little bit more technically, is that whether or not the other drug could also provide the same function under FDA regulations, you're not allowed to market or promote that other drug unless you have FDA approval for that particular indication. So what he's talking about is you had incontestable demand, which is a lot like in ZF Meritor, the performance transmissions that Eden had and that the plaintiffs didn't have. But here, again, a fortiori to those cases. What Sanofi did was expand that incontestable demand. It wasn't just, for example, the unique cardiology indication it had that gave it a head start over its competitors. But through the FUD conduct, the bleed game, the unlawful marketing conduct of false, unlawful claims of product superiority, they expanded that. The fear, uncertainty, and doubt, I guess is what that stands for. What's the evidence that that actually caused people not to go and use a competitor's product? Well, we have actually in our briefs a couple of hospitals where we have specific evidence. It's the Citrus Memorial and University of Pittsburgh. We have an appendix of examples. And then we have the statistical evidence. Let's take UPMC. What was the evidence with regard to UPMC? There was evidence in the brief, Your Honor, that it realized that it could save money on Fragman but was afraid of the FUD, the claims of, well, you may have product liability claims. You may lose your license. And that's described in our brief. But I'd emphasize that here it's a total picture. And that's what Confidential Law talks about, LePage's talks about, Embank, is you look at all the conduct together. And what we know is that the market share requirements, together with the formulary access clause restrictions, together with the FUD and other illegal marketing, all together allowed a monopolist with already a super competitive price to continue to raise its price. And what happened is the loyalty, sorry, is the discount in effect like a loyalty price plan, if you will?  Look, Willie. What we would call, Your Honor, is paying for exclusivity. And what's happening here, as we explained in our briefs, is that they're not paying this money to sell more products. So that's why you're making this not a predatory pricing claim but rather an exclusive dealing claim. Yes, Your Honor. Is that the assigned program? I think it was called the loyalty. Exclusive dealing plus, plus all the other conduct. And that's very important here as it goes even beyond the conduct in ZF94. The assigned loyalty price plan, isn't that a similar program? Number one, it's not similar. You look at the brief and you see that the thresholds are substantially, substantially lower, number one. But it was designed to encourage the same thing. It was designed by an 8% or 4% participant, not by somebody with 92%. And that, as we see from the Supreme Court and this Court, is all the difference in the world that while it might be considered very competitive for a small entrant, we can say we'll give you the following deal if you get 50% from us. But it doesn't happen. We got 8%. But you had somebody with 92% imposing that dead zone and basically putting in what Sanofi itself called market share handcuffs. And that's what they did. Your just calling it that doesn't necessarily mean that that's an antitrust violation. But we have a whole set of examples in our appendix. We have Omnicare in White County, for example, where those handcuffs worked. Where even though Frackman was charging less, hospitals felt they couldn't leave Sanofi. And then you had the formula reaction. This was by price discount rather than by exclusive contracts or other antitrust shenanigans. No, Your Honor, certainly not any more than in ZF Meritor and Benchply and LaPage. We have only one product here, and we don't have a restriction of the availability of the product if you violate the so-called contractual obligations. ZF Meritor only had one product. And you couldn't get transmissions if you didn't go along with the scheme. Your Honor, as we said in our brief, Sanofi says, well, there were threats of termination, but there were no threats discussed in that case. And get back to the general point of the different countries. Let me pick up on one question that really is an outgrowth of what Judge Roth just asked. These contracts here were not long-term. They were very short-term, were they not? No, the period that we're addressing is roughly five years. No, no, the contracts. But the contracts. In Densply, the contracts were not even really contracts. They were purchase orders that this Court said could be terminated at will at any time. And what this Court has emphasized in all those cases— Well, the Densply was a bundling of a lot of products, correct? Well, Densply was mostly— In order to get teeth, which Densply was the major market maker, had a huge portion of the false teeth business in this country, and they were tying it in with other products. Were they not bundling them? Densply was mostly about the exclusivity with the dealers. They did sell some other products. But the key in Densply was the teeth. It's a little different, I think, from LePage's, where 3M had a much broader product line. What I'd like to emphasize— But here you've got one prescription, Levinox. One product, as in ZF Meritor. The market there was heavy-duty truck transmissions. But the difference between, for example, Brook Group, where you had— One of the factors, what I'm picking up on, is one of the factors that ZF Meritor talked about is the duration of the attempts to decrease competition. And there you had seemingly much lengthier contracts. Well, here these contracts were short-term and, as I understand it, could be either not re-upped or terminated very quickly. But, again, in Densply, they were extraordinarily short-term. And the emphasis in both Densply, LePage's, and— As I said, Densply here, you do have a single product here. —is what actually happened. And what we know actually happened here is that even if hospitals were theoretically free to, quote, walk away, they didn't. Sanofi uses its monopoly power, and it's— And it isn't, if you were going to apply Professor Elhag's analysis here, don't you have to take— If you want to apply Densply, don't you have to say, while this is a single product, unlike what you had in Densply, the fact that you have, or the theory that you have, contestable and incontestable elements in effect gives you the same leverage that you would have if you had other products, such as you had in Densply or LePage's. Yes, it's the incontestable demand combined with Sanofi's expansion of that incontestable demand through the disparaging unlawful conduct. But, unlike CF-Narco, you had the incontestable demand, the performance transmissions. Here, they actually went beyond that and, through their FUD, their bleed game, tried to lead hospitals to believe, at least to fear, that the cost of using rival products was higher than it actually was, which expanded that incontestable demand. Can I ask you about the price-cost test that seems to have been applied by the district court, in this case, in its opinion, and you were referring to ZF-Meritor. In that case, there is a footnote that I found somewhat interesting, a footnote 11, in which the court held that the price-cost test applies to market share or volume rebates offered by suppliers within a single product market. That's your circumstance. And so, in that case, there is a holding that the price-cost test applies to your circumstance. Does that answer your comment on that? The answer is no, it doesn't. First of all, in our circumstances, we have far broader anti-competitive. Do you think we have to pay attention to that holding? No, and let me explain to you why. First, we have far broader anti-competitive conduct, the formulary access clause and all the illegal marketing. On the particular issue of the market share reference in footnote 11, number one, it's not binding because it's dicta. It doesn't deal with the dictum. It doesn't deal with the holding at all. In fact, it specifically says it's dictum because it starts off the footnote saying, we're responding to an argument by an amicus, the American Antitrust Institute, not to the parties. And, of course, it's dictum with respect to LePage's, which was an en banc decision. So, in a way, it's trivially not binding, but it's also not persuasive. And let me take you through that. Most of the discussion says, well, LePage's was different because there was a multiple product market and the court there, en banc, analogized the situation to tying rather than to Brook Group, pro-consumer, low-cost pricing. But that's a difference without a distinction because when you're looking at it, the question is, is this within Brook Group or is it something else? And whether it's something else because it's like tying or as the court in ZF Meritor actually held, it was de facto exclusive dealing, it's still not in the safe harbor. But it's actually a fortiori for us because when you go to LePage's, which is what this footnote is distinguishing, LePage's deals with bundling, with multiple product bundling. And the court en banc there said, no, that's not within the scope of Brook Group. And it said that even though the defendant there was able to argue, well, what we're trying to do is make our product offering more attractive across multiple products, which is what caused the issue, but they were trying to make their product offering more attractive. That's not what's happening here. Sanofi isn't trying to make its product more attractive to consumers. Sanofi is making its product less attractive to consumers by continually raising its price. What Sanofi is doing is trying to get away with raising its price from already the top in the market while maintaining its monopoly market share by making rival products artificially even worse through its formulary access clauses, its market share requirements, its illegal marketing. That's the key difference I would ask the court to focus on is it's not as in Brook Group. If you're going to make your product more attractive to consumers by lowering your price, that's good. But Sanofi didn't want to do that. It could have offered volume discounts. Brook Group explains exactly how you do that. But it didn't because it wanted to have it both ways. It wanted to maintain its monopoly market share and continually raise its price. And the way it did that was not by making its product more attractive, which it didn't, but by making ours less attractive. Are you saying that a discount that is based in part on the use of competitors' products is an antitrust violation? I'm saying that, number one, it's not a discount. Well, I'm calling it a discount. A payment of money. You can take my question the way I would. If you offer money to a customer, as here, not to try to sell more, and we explained in our briefs how the operation of their program was not designed, at least very much, to sell more of their product. It was designed to get the hospital not to buy our product for exclusivity. We're saying that that's not. Well, you're going to need Loganox or you're going to need the equivalent, and so you're going to buy something. And if you discourage them from buying your competitor's product, you're going to buy your product. Not necessarily. In a market in which price goes down, normally economics would tell you that volume will go up. But the demand for Loganox or the demand for the equivalents is based upon medical need. And if hospitals need to buy it, they're going to buy it from somebody. But that's the point of many of our experts, Rosenblatt, Casanova, Melvin, is that within the indications, these products are comparable for medical need. And that's what the whole, for example, the Formulary Access Clause was designed to stop, was what they call therapeutic interchange, where a hospital may say if two products can provide the medical need but one is cheaper, we want to emphasize the cheaper product. But the Formulary Access Clause was soundly using its monopoly power to say no. It doesn't matter how low ASI reduces its price. They still can't get ahead of us on the formulary. But they can get equal to you. They can get equal but not ahead. And it's the ability to get ahead, or from Sanofi's perspective, to fall behind, that puts competitive pressure on their pricing. And that's what this was all about, not trying to sell more by Sanofi, but trying to raise its price. And what they were doing is saying if we can take away the rival products providing competitive pressure, they're quality products, they're lower priced, if we can find a way that they do not pressure our price, then we can continue to raise our price. And the way they did that was by artificially making our products look worse. I've been watching, let me give you an example. I've been watching a lot of football lately. And it reminds me of the defensive back who is perfectly free to run as fast as he can to get to a pass before the receiver and get intercepted. That's competition. That makes the game good. But the defensive back is not free to grab the receiver by the shoulder and pull him back so it's easier for the defensive back to get to that pass. And that's what Sanofi did. It did run faster, as the Supreme Court said. That's the game you're talking about. If you're talking about the Detroit Cowboys game, that happened and they called back. We're watching the same game. There is a non-quantitative dynamic, it seems to me, at play here, which is that Levinox is pretty much the first drug on the scene. And so it immediately had the market share. It was able to win the hearts and minds of hospitals and doctors and, therefore, have royalty.  On the other hand, I don't see anything that prevented Acai from doing the same thing. Acai came in, I guess it was about a year, I'm sorry, Fragment came in about a year and a half or two after Levinox did. Acai competed when they got the product by substantially lower prices, by substantially greater promotional efforts. I think we said that we had three to one promotional expenditure per unit compared to Levinox. We competed in a way that even Sanofi called our marketing efforts, quote, competitive threats. So we were competing, and this is in distinction to ZF Narator, where the court said that defendant's price was lower than the plaintiff's price, not higher. But the other side would say that there were a huge number of doctors that were very loyal to the Levinox brand. And Sanofi was perfectly free to continue, as was the defendant in ZF Narator. It could have just continued to try to unilaterally raise its price if it wanted to, if it had brand recognition, product line scope, for example. They could have done that. To get back to my question, which I don't think you answered, a discount that is based in part upon the percentage of use of a competitor's product. Is that an antitrust violation? The answer is it can be, depending on the circumstances. If you have an 8% market participant saying that, then it may not be. When you have a 92% monopolist, persistent monopolist doing that, then certainly under the facts of this case, it is. And in any event, we submit it's not within the safe harbor. But it certainly can be an antitrust violation, as this Court found in ZF Narator. But it's a manipulation of price, isn't it? It's not a manipulation of price. And I think when you go back and look at the concept of LePage's en banc, and then Densply and ZF Narator, you see the Supreme Court saying that the – provide antitrust immunity to any defendant that comes in and shouts price in a crowded courtroom. What it has to be is a price that benefits consumers, plainly benefits consumers. And they said that in Brook Group, that's what happened. Now keep in mind, in Brook Group, the defendant only had 11% to 12% of the market. So it didn't have any choice except to try to expand its business by making consumers happier. And it engaged in a price war to reduce the price of its black and white cigarettes. Here you have a monopolist who could have just reduced its price. In fact, we know that it knows how to do that because when there was generic entry in 2010, what did Sanofi do? It almost immediately, within days, dropped its price by 20%. Right? And it abandoned its LeBanonx contracts, abandoned the market share requirements, abandoned the formulary access clauses. So Sanofi knew how to do that. It knew how to do exactly what the Supreme Court said in Brook Group it could do. But it didn't want to till that generic entry because it wanted to make hay while the sun was shining to both maximize its market share, keep its market share high, and be able to keep raising its prices, which is what it did. And so it didn't benefit consumers as the defendant did in Brook Group. It hurt consumers. It kept raising prices in a market where Professor Rosenblatt said you would normally expect prices to be going down because of the competition. You also increased your price. Fragment also increased its prices. So I was wondering if in order to compete, and especially in that dead zone area, why couldn't you lower your price? Why couldn't Fragment lower its prices? This is something I was getting to. First of all, of course, we were already substantially lower. But the impact of Sanofi's anti-competitive conduct took away much of the benefit from the rivals of further lowering their prices. Let me explain that. The benefit, why would you lower a price? You would lower your price because you thought that even though you're getting less per unit, you can sell more units and offset the lower price and offset the additional cost of the more units, right? Well, you also lower your price to increase your market share. Well, that's what I'm saying is to sell more units. But what the Sanofi conduct did is said, basically, you can lower your price, but you can't get substantial more market share. You can lower your price to virtually nothing if you want, but you still can't get ahead of me on a hospital's formulary. You still can't get primacy in front of me in terms of the formulary. You just get placed before another competitor. Is that it? It's placement on a formulary list, right? Yeah, so in terms of therapeutic interchange, when you could use one product or another product, to be said, well, we're going to prefer this one, in part, in our case, because the price is substantially lower. And so what that did was, and this is just like in Densply, where the court said, and that's Densply pages 189 and 190, is the court said it wasn't apathy of Densply's rivals that made them less aggressive. It was a result of the exclusionary policies, and that's what happened here. Objective perspective. Back to where we pretty much started. Let's just say you've placed prior on the formulary list. You're placed ahead of a competitor. What evidence is there that there was any actual harm from that? Any actual harm from that? Any decreasing of competition with regard to your client's drug fragment? There's evidence of both harm to competition and harm to us. The evidence of harm to competition is that notwithstanding what you would expect in a market with quality products with lower price, someone who is able to continue to raise its price. That's the harm to consumers. Consumer choice was stifled. Quantity didn't grow as fast. All the anti-trust indicia of harm to competition, price, choice, quantity, were harmed. And we know from Professor Alhaug that he said that the competitors were foreclosed from 68% to 84%. In terms of harm to us, it's not foreclosure. Plus, we have our yardsticks that all show that when we were free, in a world free from Santa Fe's anti-competitive conduct, we would have had between 28% to 54% of the market. And that would have benefited not only us, but consumers, because it would have been a bigger market share for a product at a much lower price, a comparable product in general terms. And it would have forced Santa Fe, if we had been able to get to, let's say, 50% of the market, that would have forced Santa Fe to reduce its price, not raise its price. That was its whole plan, is by putting the rivals in the corner and constraining their growth, constraining the ability of hospitals to choose those products. It said, even though you're a lower price, I don't have to worry about you that much, because if I can still make 82% of their sales at my rising prices, then I'm good. This program was for about how long, about five years? The program at the time that we're at issue, when ASI took over the product, was about five years. I don't know what the exact price increases were, but were there normal price increases given rising costs, expenses, and so forth? Or were they so high that it was clearly monopolistic? I think there are two answers to that. One is that they were above. Santa Fe, in its brief, argues about a price index. I think you see it as about the same, maybe a little bit higher than that. You can see, again, in Elhough's figures three and six, the price increases. But the key point here is, as Dr. Rosenblatt explains, in this market, if this were a normal functioning market where the price mechanism was working, price would have gone down, because Santa Fe already was charging monopoly price. And we know it was monopoly prices because when the generic entry came, they immediately dropped their price by 20%. So what would have happened was price would have gone down. It's not a question of by how much. We're not in 1982 where there was inflation of 15% or 18%. Price under normal economics and pharmaceutical economics, as Dr. Rosenblatt explains, should have been going down. Hospitals were free to say, well, for this purpose, I can choose either product. I'm going to get the cheaper fragment or the cheaper eryxtra. Then prices would have gone down, both because they would have been paying less for the products they bought from the rivals and because it would have forced Santa Fe to reduce its price or its market share would have gone down even more. That's why Santa Fe didn't do what the Supreme Court plainly invited it to do in Brook Group. The Supreme Court said, you want to exclude your competitors, just lower your price unilaterally, as the court in Weyerhaeuser says, and you're good. At this point, why don't we get Mr. Carey up, and then we'll get you back on rebuttal. Thank you. Thank you. Good afternoon, Your Honors. George Carey for Santa Fe. Almost afternoon. We're close. Your Honors, this case is about condition discounts. There's nothing alleged in the contracts that Santa Fe had with its customers for Lovinox that did anything other than make a condition discount. None other than to grant conditional discounts in exchange for meeting certain market share thresholds. Are there any pro-competitive benefits to Santa Fe's price structure? Yes, Your Honor. I think the Concord case makes it very clear. ZF Meritor makes it very clear. Okay. So what are they? The pro-competitive benefit is competition. It is that Santa Fe is seeking to incent customers to give it a higher market share by offering discounts in exchange. That's the very essence of competition, which is what the Supreme Court said in Matsushita. In Virgin Atlantic, the Second Circuit said that rewarding loyal customers is a way to compete for business. It almost sounds like you're restricting consumer choice by effectively raising your competitors' prices, if you follow what Mr. Fastell's analysis. Yes, but Mr. Fastell's analysis is incorrect for the following reason. He continuously refers to A-size low prices. In fact, for those customers who started off with Loganox and had a high percentage purchase of Loganox, A-size prices were higher. They only offered substantial discounts if somebody would commit to shifting 50% of the purchases for them. In other words, shifting market share is what competition is about. They charge prices about 15% to 20% higher than Santa Fe's prices to customers who are buying 75% from Santa Fe. So they were basing a discount on the percentage of the product that was bought from them rather than from competitors. Yes, exactly. It's the same thing they're complaining about with you. They're saying because they were 8%, it was not harmful. That's right. They're saying different rules apply because we were first in, we were successful, we had an installed base before they entered. That's not what the Supreme Court has said. That's not what this Court has said in ZF Meritor. Can I ask you a relevant question? Why is Santa Fe spelled with a lowercase s? I think it's probably some clever marketing person, Your Honor. I thought it might be a typewriter that didn't work. Either that or it was crafted by E.E. Cummings. That's right. But the point again is, Your Honor, A-size prices were not lower than Santa Fe's prices to those customers who were already using Santa Fe. They were higher. They priced at $151 and $183, whereas Santa Fe's price was $151 to those customers. They chose a pricing strategy. Their strategy was match Lovinox's list price, and as Judge Fuentes pointed out, when Santa Fe's prices went up, their prices went up, and then only give discounts to those people who were buying a majority of their purchases from them. It's a pricing strategy. Meritor makes very clear. It couldn't be any clearer, and I'll quote. Price-cost test, quote, extends to above-cost discounting or rebate programs, which condition the discounts or rebates on the customer's purchases of a specified volume or a specified percentage of requirements. That's what this is. So the clear holding in ZF Meritor applied to the clear facts, undisputed facts here, mean that summary judgment was appropriately granted. But it's the formulary program that the way it was set up was to discourage other hospitals or hospital organizations to not buy from your competitors. Your Honor, the only repercussion of violating, if you will, the formulary access clause is to lose the discounts. So if they wanted to offer their own discounts, which were more valuable, if they wanted to compete on price. But it was set up so that the more you buy from us, the less you will buy from any of our competitors. Well, that's what market-share discounts do. By definition. The bigger discount you will get by buying less from our competitors. Right, and that's what market-share discounts do. The question was asked, is that illegal? Mr. Fastow responded, it could be. ZF Meritor makes unambiguously clear. It is not illegal as long as those prices are above cost. In the paragraph that I just read to you from page 274 in Meritor. If all you're doing is offering a market-share discount, the more you buy from me, logically, the less you buy from others, you get a lower price. Unless that lower price is below cost, ZF Meritor could not be clear. And on formulary access, again, the only stipulation is you will not disadvantage Sanofi in order to get the discount. You can choose to forego Sanofi's discount and instead take an equivalent discount from ASCI and convert 50%, 60%, 70%, whatever percent you want. It's a matter of price competition. They chose not to compete for our lowest customers by charging them a high price and not giving them a discount. As your Honor pointed out, a new entrant in a marketplace typically will come in and offer a discount in order to entice customers to move away from the product they're using. They chose not to do that. They chose to preserve profits at the expense of market-share. And then they say, now put the handcuffs on Sanofi. Now prohibit Sanofi from offering its own discounts. Well, as Matsushita makes clear, that is the essence of competition. Each company can go in and try to entice customers to move by offering a better price. Is it fair to say that if you have a competition between two products with different but overlapping functions, some are the same, some are different, that the market's demand for the overlapping functions is a contestable part of the demand while the market's demand for a function that only one of them has is an incontestable part of the demand or the market? Your Honor, I would not describe it that way. I understand. And that's Professor Elhag's analysis. But what's wrong with that theory, which I've probably stated quite simplistically? Yeah. What's wrong with that theory is, well, the first thing that's wrong with it is, nowhere in the case law does that theory, can it be found? I understand that. And that's a question for the other side. But as a theory, does it make sense to at least in terms of setting up the players, use that as a way to understand the issue before we actually get to the issue? Your Honor, I don't think so. And it goes back to the distinction that Z.F. Meritor drew between LePage's and the facts in Z.F. Meritor. In LePage's, you're talking about different product markets. So you're talking about products that are not functionally interchangeable. Here, these products are in the same market. You heard Mr. Fasto say that the – Yes and no. To some extent, they're the same market for deep vein thrombosis. To some extent, they have other – each has other things that it can treat that one has, the other one does not. So what's wrong with saying, okay, I'm looking for a way to analyze. They're saying that there's been an antitrust violation. You're saying there hasn't. How do I go about at least setting up the players or setting up the parts of the issue that I need to look at before I do the actual analysis? I'm almost actually asking you a factual means of making sure that I have the predicates for the analysis correct. Right. So let me walk through several levels of that question. First level, if they're in the same market, which is what ASI alleged here, then they are functionally interchangeable. Factually, they have alleged that they are clinically interchangeable. In part. No, the lack of a label indication does not prevent a physician from prescribing either drug for any of the indications with respect to these kinds of products. It precludes the pharmaceutical company from promoting it. It does not preclude an individual physician from prescribing it. And, in fact, many hospitals converted 100% to Fragment for all uses. And in other countries, they're used interchangeably for these other uses. What function of Sanofi's drug, Lovinox, would a doctor prescribe that is not contained in Fragment? I don't believe there are any. I believe the record here is that these products were clinically interchangeable. There's 100% overlap. 100% overlap. There were differences in label indications, but as the judge below indicated, that is a function of quality competition. In other words, ASI could have done the clinical trials, could have established the label indication, and then been free to promote it. So that's point number one. Because they're in the same market, because they're clinically interchangeable, it's a function of competition, quality competition, what indications you go for. Fragment had its own indication in oncology. Sanofi went for its indication in a particular type of cardiac use. But in any event, going to the second part of your question, as a factual matter, those indications are less than 10% of the market. Would a doctor think of Fragment with regard to that particular type of cardiac use? Yes. Still would? Yes. Still could? Still could, yes. The only prohibition is that the company is not permitted to promote for that use if they don't have a label indication. Hospitals can and did switch 100% away from Lovinox. But if a company can't promote for that use based on the approval that's been given to it, doesn't that really make the case for the other side that there are differences between the two drugs? Some overlapping, some not? The only difference is that Sanofi has invested in those clinical trials. ASI invested in different clinical trials. Nothing prevented ASI from getting that label indication. Chose not to do that. But, again, in terms of the facts of this case, which your Honor asked me to apply it, here both indications, their indication is around 5%. The cardiac indication is less than 8%, 8% to 10%. So it's a very small portion. Even if you were to look at that as incontestable, they could have overcome any discount offered on account of those indications, and they did so. There are hospitals that converted 90% to Fragment, 85% to Fragment. The record shows that hospitals in a variety of contexts have different splits between Fragment and Loganox, and the conclusion as to which one to use is based on the doctor's preferences, the hospital's preferences, and the price. And when they did, in fact, go out of, when ASI went out of its template of structured discounts and offered greater discounts, the record evidence is that they usually won those contests. It was only because they chose not to extend that so-called out-of-template program further, they chose not to compete on price further, that their market share was what it was. I would imagine you would be a fan of the price-cost test in this case. Yes. But you heard your adversary on the other side say LaPage really controls, and the price-cost test that was adopted in Meritora was in the fashion of a footnote, and it was dictated. Can you respond to that? Yes. First of all, it was not in the footnote. It was in the text at page 274 to 276. They described the price-cost test. Well, footnote 11 says, Accordingly, we join our sister circuits in holding that the price-cost test applies to market share or volume rebates offered to suppliers within a single product market. But you can't really make that holding in a footnote to contradict what was done in Bank and LaPage's, right? That's correct. But LaPage has made very clear that the gravamen, the thrust of LaPage's, was about bundling products in different product markets. It was using the market power in one product market in order to extend the monopoly in another product market. And the court analogized in LaPage's that conduct to tying and said it's the same infirmity as tying. And unlike here, where ASAP could have done a clinical trial and gotten any label indication that was appropriate for this category of drugs, it's not the case in LaPage's that LaPage's can go off and enter a variety of different product markets in order to counterbalance that impact. That's the fundamental difference. That's why the court correctly said in a single product market case, the price-cost test will always apply if that's the record. ZF Meritor was a single product. Sorry? ZF Meritor was a single product, manual transmissions. Yes. And the court there didn't ultimately do a predatory pricing analysis. It did an exclusive dealing analysis, did it not? Yes. So why can't you do that here? It goes straight to the alternative holding of Judge Cooper. Right. Because in ZF Meritor, the majority opinion was very clear that access to the product was jeopardized. Access to Eaton's products was jeopardized. If you did not comply with their demands, you would lose that product. And that product, because it was a highly popular product among drug buyers, was something that dealers could not afford to lose. And, in fact, I would urge you to review the oral argument transcript, where Mr. Fastow said, quote, no, they wanted their only placement in the books. They wanted exclusivity. Quote Mr. Fastow again, they wanted the other products out. That was a very different case than this one. In this case, no hospital is precluded from buying as much Lovenox as they want. The only repercussion of not meeting a market share target is that you don't get the associated market share discount. The argument or the theory is that there is this dead zone where it is economically unappealing to any rational person to have a competitor purchased in lieu of Lovenox. Yes, the dead zone is an artifice of ASCI's pricing decision. As Judge Cooper points out, if ASCI increased their discounts, that dead zone shrinks. And eventually it shrinks down to virtually nothing. They chose not to drop their discounts. But your answer necessarily assumes that there is a dead zone. You're just disagreeing on the amount of the dead zone. No, no, I don't agree that there is a dead zone. I was merely using their definition. And this is critically important. Professor Elhag essentially redefines foreclosure in a way not to be found in the case law. Foreclosure is about the opportunity to compete. They had the opportunity to compete. They had customers at the wide range of market shares. They chose what their discount structure would be. And they chose when to discount to win business and when not to discount to win business. There is no dead zone. So could the sale by ASCI of Fragment ever be so low as to eliminate completely the dead zone? The price could be, yes. How so? Well, I think in the, well, using, first of all, every customer can be competed for by offering the maximum discounts that ASCI was prepared to offer. So Professor Elhag himself says that if ASCI were able to convince a customer to buy more than 64% of its requirements from it, the dead zone goes away. If they were able to convince them to buy less than 10%, the dead zone goes away. Within the range, so every customer is open to competition. All they need to do is come in and say, convert to us, convert 60% to us, 70%, 80%, whatever it is, and you will be better off having converted to us than sticking with Santa Fe's discounts. That's number one. There is no dead zone. If the customer was not prepared to convert 60%, let's say they were prepared to convert 50% or 40%, all ASCI need do is go out of template, as they call it, instead of the 40% discount that they offer for 50% or more, go to 48%. The dead zone shrinks, and again, I use that terminology as they use it, not because there is such a thing, but the dead zone shrinks. They can compete for 100% of the customers simply by convincing them to buy more than 64% from them, or by offering greater discounts and buying less of their requirements from them. There is no customer that's off limits to competition, and that's why this is not foreclosure, and that's why Professor Elhage needs to redefine the term in a way that's not found in any of the case law in order to make the case that there is foreclosure here. Thank you very much. Thank you. First of all, Santa Fe's Council studiously avoids lepages and dead supply. Can't ignore that. Second, on this question of incontestable demand and the dead zone, that's exactly Well, I mean, his point about lepages and dead supply is that they were bundling of multiple products, and you're trying to apply that to a single product case with what you argue are overlapping and some distinctive functions. He's saying that actually they're the same functions, but you have only permission to put them out there for certain of those functions. So what we're saying is that the payments for exclusivity are more anti-competitive than the bundled rebates in lepages, because in lepages at least the defendant was saying, I'm trying to sell more of my products across my multiple product lines. Here what Santa Fe is saying is I want to be able to raise my prices, and so I'm not going to make my product more attractive. In lepages, 3M said I'm making my products more attractive. It's still lost. Here what is happening is Santa Fe is saying I'm making my products less attractive to consumers, and the way I'm going to do that is by making rival products even more unattractive artificially. And so what you have is counsel says that the notion of incontestable demand isn't in the case law. That term isn't used, but it's very clear in ZF Meritor, the whole discussion of the full product line. Just as counsel says theoretically we could have gotten FDA approval for another indication, there theoretically the plaintiffs in ZF Meritor could have created a factory to build performance transmissions. That's a very different situation. No, Your Honor. And when you are applying to the FDA for approval and use, you can think ahead of what you need or you can adapt without having to build a whole new factory. First of all, I shouldn't say build a whole new factory. There was a factory. It could have added a line of performance transmission. I don't mean to suggest a whole new factory. And second, getting FDA approval is a very expensive proposition. The district court says that there are barriers to entry in this market in large part because of the FDA barriers. So it's not an easy thing. And to say that, well, all they could not do is promote or market it. Well, imagine if you had to go to a store and the store couldn't say you can drink Diet Coke for refreshment. You know, we can have it sit here, but we can't tell you why it's good for you. Well, that's why the FDA barrier. It's not good for you. My wife would agree with you, Your Honor. So you do have, plainly, that same proposition in the ZF Maritor case. And what you also have in ZF Maritor, and Santa Fe's counsel suitlessly avoids again, is the scope of the anti-competitive conduct, that the court in ZF Maritor used the standard of clearly predominant, that low price was the clearly predominant mechanism of exclusion. But here, whatever you want to call their payments for market share exclusivity, here we have the formulary access clauses, and we have the whole set of FUD and other anti-competitive marketing conduct. So even if you were to believe that the payments for exclusivity were real group discount, it still wouldn't fit this case into the safe harbor because of all the other anti-competitive conduct that was implemented by Santa Fe as an abuse of its monopoly power to try to protect its high and rising prices. And on the footnote 11, which keeps coming up, I want to emphasize that with all respect, the accordingly sentence, the reference to market share, and that's picked up a couple of times in the text, but footnote 11 is the real discussion there. With respect, it's a non sequitur. When you look at the discussion before that, all it's saying is, well, LePage's was a multiple product market. This is a single product market. And I've explained why I submit that this court can't overrule LePage's. But number two is, then it says accordingly it starts talking about market share payments with no discussion as to whether market share payments are or are not within the scope of Book Group. And the cases that it cites, similarly, there is no discussion in any of those cases saying, all right, this is what market share payments are, and we're going to look at them to see whether this is what the Supreme Court was talking about in terms of benefiting consumers by lowering prices. So while it says that, it says accordingly, there really is, as you read it, no accordingly there. The discussion before that was on a completely different topic, simply distinguishing multi-product case from a single product case that doesn't go to whether market share payments are or are not within the scope of Book Group. The last point I'd like to make is that when you listen to Sanofi, you read the district court decision, it just brings you back to the fact that this was a summary judgment motion. And Sanofi makes all kinds of arguments about price scenarios and price situations. LHAL Fig. 3 shows you the average prices, with Sanofi's prices being substantially higher than ASI's prices. And if there are issues of fact to be decided, particular sales and marketing scenarios, well, that's for the jury. That's not for summary judgment. Thank you. Thank you very much. Thank you both, counsel, for very well presented arguments. We'll take the matter under advisement. We would ask, as I had done in the previous case, if counsel would get together with the clerk's office, have a transcript, a pair of the sole argument, and just put the cost evenly. Thank you.